**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: YAZOO PIPELINE CO., L.P., *et al.*, | § | BANKRUPTCY CASE NO. 08-38121 |
| | § | |
| Debtors. | § | |
| | § | |

| | | |
|---|---|---|
| OKIN ADAMS & KILMER, LLP, | § | |
| | § | |
| Appellant, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-10-1996 |
| | § | |
| JOSEPH M. HILL, TRUSTEE, | § | |
| | § | |
| Appellee. | § | |

**MEMORANDUM AND ORDER**

This appeal from the bankruptcy court's award of only some of the attorneys' fees sought

by debtors' attorneys for their work in three related cases raises questions of how to apply *In re Pro-*

*Snax Distributors, Inc.*, 157 F.3d 414 (5th Cir. 1998).   Okin Adams & Kilmer (OAK) sought fees

for representing the debtors in Chapter 11 proceedings that were converted approximately a year

later to Chapter 7 proceedings.   The cases were converted after the bankruptcy court determined that

OAK's reorganization efforts were not likely to succeed and that the debtors were continuing to

incur large unpaid administrative expenses.   In its fee application, OAK sought approximately

$370,000 in fees and expenses for representing the debtors in the Chapter 11 proceedings.   The

bankruptcy court denied most of the fees and expenses that OAK requested.   The bankruptcy court

awarded OAK $60,000 in fees and expenses for three categories of legal services that it found met

the *ProSnax* test for identifiable, tangible, and material benefits to the debtors' estate:  the initial

review to learn the issues and facts of the cases; negotiations with the State of Texas General Land

Office to resolve a dispute over four oil and gas leases and over past-due royalties; and, to a lesser

extent, work with respect to debtor-in-possession funding.  OAK appealed the bankruptcy court's order.[1]  There was no cross-appeal from the bankruptcy court's fee award.

Based on a careful review of the briefs, the record, and the applicable law, this court affirms in part and reverses in part.  This court affirms the denial of fees and expenses for legal services other than the three categories identified by the bankruptcy court and affirms the finding that those three categories of legal services were compensable.  This court reverses the award of $60,000 because there is an inadequate explanation of the basis for fixing that amount.  This case is remanded to the bankruptcy court to determine the amount of time reasonably and actually spent on providing the three categories of compensable legal services found in this case and the reasonable fee for that work.

The reasons for these rulings are explained in detail below.

## I.  Background

### A.  The Chapter 11 Case

Charles Cheatam owned and managed several oil and gas companies, including Sterling Exploration & Production Co., LLC; Yazoo Pipeline Co., L.P.; and Matagorda Operating Company. Sterling, an oil and gas exploration and production company operating in Texas state waters, owned oil and gas properties in the High Island Area in Jefferson County, Texas and in Matagorda Bay in Calhoun and Matagorda Counties, Texas.  Chatham owned 99% of Sterling, and Matagorda owned the remaining 1%.  (Docket Entry No. 160).

Cheatham also owned Yazoo, an oil and natural-gas pipeline company.  Yazoo's pipelines

---

[1]  This court has appellate jurisdiction under 28 U.S.C. § 158(a): "The district courts of the United States shall have jurisdiction to hear appeals . . . from final judgments, orders, and decrees . . . entered in cases and proceedings referred to the bankruptcy judges . . . ."

are located in Texas state waters in Matagorda Bay in Calhoun and Matagorda Counties and have onshore extensions in both counties.  Yazoo also had pipelines in the High Island Area in Jefferson County.  Yazoo's pipelines transported Sterling's oil and gas to shore for delivery to purchasers.  The pipelines also transported oil and gas for several other companies.  Chatham owned 99% of Yazoo, and Matagorda owned the remaining 1% interest.  Matagorda did not have independent operations or assets beyond its interest in Sterling and Yazoo.  Cheatham owned all of Matagorda's shares.  (*Id.*).

Before the debtors filed for bankruptcy, Mining Oil provided them with financing in exchange for security interests in the debtors' properties.  Randy Sorrels, a Mining Oil owner, bought the debtors' secured bank debt from Amegy Bank.  The debtors defaulted on their loans, and Mining Oil gave the debtors notice that it intended to foreclose on the properties and sell them.  (*Id.*).

On December 23, 2008, Sterling, Yazoo, Matagorda, Cheatham, and his wife, who were then all represented by the same lawyer, filed voluntary petitions under Chapter 11 of Title 11 of the United States Code.  (Docket Entry No. 1).  The cases were jointly administered.  (Docket Entry No. 8).  In early January, the debtors contacted OAK about representing them.  The bankruptcy court entered an order authorizing OAK to represent the debtors effective January 9, 2009.  (Docket Entry No. 39).  The original lawyer continued to represent the Cheathams personally.

After the bankruptcy cases were filed, the debtors incurred unauthorized administrative claims.  Many of these claims were filed by vendors who provided goods and services to the offshore wells and platforms.  Some claims were by contractors Cheatham had hired to repair

hurricane damage to a pipeline, damage that had occurred before the bankruptcy filings.[2]  The debtors did not have enough cash collateral to pay these vendors or contractors.  The debtors also failed to timely file their first few monthly operating reports ("MORS").  The MORs for January through March of 2009 were all filed on April 22, 2009.  (Docket Entry Nos. 139, 140, 141).

OAK explored with several entities the potential of an interest in the debtors or the debtor's assets.  The first of these potential purchasers, Elliptical Production LLC, expressed interest in purchasing an 80% interest in the debtors for $7 million.  Elliptical also offered the debtors a $300,000 DIP loan to cover their expenses until the proposed sale could be completed.  (Docket Entry No. 25).  The potential sale quickly evaporated; on January 27, 2009, Elliptical backed out. (Minute Entry dated Jan. 27, 2009).  Houston American Energy Corporation (HAEC) then stepped in to provide a $300,000 DIP loan in connection with its own possible offer to purchase an interest in or the assets of the debtors.  (Docket Entry No. 28).  HAEC quickly withdrew its financing and purchase offers, (Minute Entry dated Feb. 25, 2009), but only after it had advanced the debtors $117,819 in DIP financing, (Docket Entry No. 29).

On February 12, 2009, Mining Oil filed a motion to convert the cases to Chapter 7.  (Docket Entry No. 32).  The motion noted the debtors' failure to file monthly operating reports or statements of financial affairs.  On February 27, 2009, after the potential HAEC deal fell through, the debtors moved to establish bid procedures for selling their  assets.  (Docket Entry No. 44).  HAEC later expressed interest in purchasing the debtors' assets at auction.  (Docket Entry No. 799, at 14).

---

[2]  The administrative claims include: Chet Morrison Contractors for $343,062.75, (Docket Entry No. 52); Derrick Construction Co., Inc. for $91,964.74, (Docket Entry No. 82); Quality Production Management, LLC for $50,531.73, (Docket Entry No. 128); Offshore Liftboats, LLC for $154,455.88, (Docket Entry No. 138); Exterran Energy Solutions, L.P., (Docket Entry No. 155); Griffin Partners 675 Bering L.P. and Beaumont Crossroads, LTD for $42,036.77, (Docket Entry No. 189); and Chaparral Energy, L.L.C. for $19,077.95, (Docket Entry No. 271).

In March 2009, New Concept Energy (NCE) expressed an interest in buying the debtors. NEC offered to pay all of the debtors' claims and to pay $750,000 to Cheatham in exchange for an 80% ownership interest in the three companies. Cheatham would retain a 20% interest and would continue to manage the debtors. (Docket Entry No. 160). On March 20, the debtors moved to enter into an agreement for DIP financing with NCE. (Docket Entry No. 73). On March 27, the bankrupcy court authorized NCE to loan the debtors $150,000 on an interim basis. The court gave final approval to the debtors to borrow up to $300,000 from NCE on April 23. (Docket Entry No. 84). The debtors used some of this money to repay HAEC's DIP financing. On April 16, 2009, Mining Oil filed an amended motion to convert the cases to Chapter 7 or to appoint a Chapter 11 trustee, (Docket Entry No. 123), but withdrew its motion a week later, (Docket Entry No. 150).

By early June 2009, the bankruptcy court became aware that the debtors' expenses had significantly exceeded the estimates in the budgets filed with and approved by the court. James Carlton, the debtors' accountant, testified at a June 9, 2009 hearing about the reasons. (Docket Entry No. 802). Carlton testified that Cheatham had contracted with Halliburton to repair the High Island 60 Well to get it back into production. (*Id*. at 11). Cheatham had written a check to Halliburton, purportedly on the basis of NCE's commitment to fund repairs to the debtors' properties. Carlton testified that the debtors' health-insurance payments also exceeded the amount budgeted, primarily because two delinquent bills had to be paid to prevent covered employees from losing their insurance benefits. (*Id*. at 12).

Shortly before the June 9 hearing, the bankruptcy court also learned that the debtors had incurred an $8,000 expense when Cheatham used this money to make home-mortgage payments to Regions Bank. (*Id*. at 14–15). Carlton had not informed Adams before making these payments.

5

Adams explained to the court:

> Your Honor, there were payments that were made that were brought
> to my attention well after the fact.  They weren't made – And they
> were not made with the knowledge of New Concept or Mr. Carlton.
> When they were brought to my attention, you know, there was
> discussion about, you know, how do we reflect this and I said we
> reflect it in the fact that we put it in there.  There was not going to be
> an attempt to conceal it and nobody was going to try and conceal it.
> There were mistakes made by Mr. Cheatham.  He[,] I don't think
> totally understood, even though I counseled him to the contrary, that
> he wasn't able to make the payment to Regions.  When he sent the
> check to Regions he said that he was sending it and having them hold
> it and then they cashed it.  I instructed him to have them refund that
> money or we would have to sue them under 549.  He said he would
> call them.  I don't know that he has called them.  But that's a
> payment that we are going to get back from Regions.

(*Id*. at 16).  Adams testified that "[n]othing's been done with intent to defraud the lender or this

Court.  There were mistakes done, gross mistakes.  It's all been disclosed." (*Id*. at 17).  Adams

asked the court to take away Cheatham's authority to write checks on the debtors' behalf and give

this  authority to Carlton.  (*Id*.).  When the court pressed Adams on why he had not done more in

response to Cheatham's personal use of the debtors' assets, Adams responded:

> I should have acted quicker.  I immediately told Mr. Cheatham to call
> the banker that he was working with and have him return that money,
> and it hasn't been done yet.  I should have acted quicker, your Honor.
> I fully intended to get that money back.

(*Id*. at 22).  The court ordered that Cheatham be removed from management control over the debtors

and that Carlton take his place.  The court permitted Cheatham to continue working for the debtors

as an employee.  (*Id*. at 26–28; Docket Entry No. 207).

   After Carlton replaced Cheatham as the debtors' manager, OAK continued to pursue

potential buyers that could fund a reorganization plan.  On June 22, 2009, the court approved the

debtors' request to borrow an additional $300,000 in DIP financing from NCE.  (Docket Entry No. 234).

One of the impediments to reorganization was a dispute between Sterling and the Texas General Land Office (GLO) over the validity of some oil and gas leases.  Sterling's lease agreements included a provision terminating the lease if 60 days elapsed with no production.  The GLO questioned the status of four of Sterling's leases.  (Docket Entry No. 277).  Several potential purchasers of the debtors' assets informed the court that their interest depended on whether Sterling's leases were valid.  (Docket Entry 799, at 5, 12, 14).  On March 26, 2009 the debtors filed a motion to determine whether Sterling's leases had terminated due to nonproduction.  (Docket Entry No. 80).  After receiving additional information from the debtors, the GLO determined that, as of March 31, 2009, all of Sterling's leases were valid except for the lease on State Tract 51-S, which had terminated due to a lack of production in "paying qualities."  On July 6, 2009, the debtors moved in the bankruptcy court to be allowed to settle the dispute with the GLO and accept its determination.  (Docket Entry No. 277).  NCE informed the bankruptcy court that any interest it had in pursuing the purchase did not depend on the validity of the 51-S lease.  The debtors also informed the bankruptcy court that there was no economic justification for contesting the GLO's determination that State Trace 51-S was invalid, given the costs of further litigation and the risk of an unfavorable ruling.  The court approved the debtors' settlement agreement with the GLO on July 14, 2009.  (Docket Entry No. 289).

Sterling and the GLO also disputed the amount of royalties Sterling owed.  After the bankruptcy cases were filed, the GLO agreed to temporarily suspend its collection of additional payments for past-due royalties.  But the GLO's approach resulted in Sterling defaulting on each

new monthly royalty bill, and the GLO charged Sterling penalties for these defaults.  On August 17, Sterling moved to approve a settlement agreement with the GLO.  (Docket Entry No. 343).  The GLO agreed to apply Sterling's future payments to the royalties owed for the current month before applying them to pay past-due royalties.  The GLO also agreed to rescind $32,000 in previously-incurred penalty charges.

On July 13, 2009, the bankruptcy court was informed that NCE was backing out of its proposed deal with the debtors.  (Docket Entry No. 806, at 6).  NCE also failed to make scheduled payments for the debtors' DIP loan.  On July 22, 2009, the court was informed that NCE was again interested in pursuing a deal.  (Docket Entry No. 807, at 16).  On October 28, 2009, another company — Downstream Capital LLC — filed a reorganization plan as an alternative if the NCE proposal proved unsuccessful.  (Docket Entry No. 458).  On November 24, however, Downstream withdrew its proposed plan due to increases in the debtors' administrative liabilities.  (Docket Entry No. 518).  By December 7, 2009, NCE had not raised the financing necessary to complete its proposed deal with the debtors.  (Docket Entry No. 528).

On December 8, 2009, the bankruptcy court held a hearing on whether the debtors' Chapter 11 bankruptcy cases should be converted to Chapter 7 under 11 U.S.C. § 1112(b)(4). (Docket Entry No. 809).  The court found that the debtors had failed to meet filing and reporting deadlines, had failed to comply with court orders, and were continuing to operate at a loss.  (*Id*. at 21–22, 36–37). That same day, the court ordered that the Yazoo and Sterling cases be converted to Chapter 7. (Docket Entry No. 532).  The court converted Matagorda's case to Chapter 7 on February 8, 2010. (Doc. No. 596).

Joseph M. Hill was appointed to serve as the Chapter 7 trustee in the debtors' cases. (Minute Entry dated Dec. 8, 2009). On March 18, 2010, the court authorized Hill to hire Christopher Adams at OAK as special counsel to prosecute pending objections to the claims asserted by Mining Oil and by Sorrels. (Docket Entry No. 627).

On April 6, 2010, OAK filed an application for fees and expenses incurred while serving as the debtors' counsel in the Chapter 11 cases. (Docket Entry No. 651). OAK asked for $364,566.50 in fees and $8,881.55 in expenses for legal services performed between January 9 and December 8, 2009. OAK stated that it worked 1,307.10 billable hours and sought to be compensated at an effective rate of $278.91 per hour. OAK's fee application divided its work into nine areas: case administration, asset disposition, relief from stay/adequate protection proceedings; meetings of and with creditors, fee/employment applications, other contested matters, financing/cash collateral, claims administration and objections, and plan and disclosure statement. OAK had previously received $263,764.86 under an interim-compensation procedures order. This amount was included in OAK's final fee application requesting a total of $373,448.05.

### B. The Bankruptcy Court's Decision on OAK's Attorneys' Fee and Expenses Application

On March 20, 2010, the bankruptcy court held an evidentiary hearing on OAK's fee application. (Docket Entry No. 748). After the parties presented evidence, the court awarded OAK $60,000 in attorneys' fees and expenses, approximately 16 % of the total amount OAK sought. (Docket Entry No. 731). The court issued findings of fact and conclusions of law orally at the end of the evidentiary hearing.

The bankruptcy court found that Adams and OAK had violated their fiduciary duties to the debtors. (Docket Entry No. 748). The court found that "early in the case . . . the entire marketing

9

effort . . . was exclusively directed at a plan that maximized the [Cheathams'] retention of their

personal interest in the Debtor, rather than maximizing the return to the estate as a whole." (*Id*., at

72). The court did note that "[a]s we move[d] through the case, counsel left that position and began

looking at options that would not have preserved the Cheathams' personal interests." (*Id*., at 72).

The court also noted that "the Debtor was not operating in accordance with the orders of the Court

or with its duties as a Debtor-in-possession." (*Id*.). The court stated that it "was constantly barraged

with legitimate administrative claims where the Debtor had incurred expenses far beyond its ability

to pay." (*Id*.). The court stated:

> Mining Oil kept telling you about [the unauthorized expenses]. . . .
> But the [OAK] firm did not. [OAK] watched its client breached the
> orders and breached its duties. And it did not come forward. And it
> did not say they were doing that. These were not issues where
> counsel could turn a blind eye. Counsel could not allow Mining Oil
> to take counsel's responsibility. We learned of these problems only
> when creditors, who lost money from post-petition operations, or
> whose secured position was in jeopardy, complained to the Court.

(*Id*., at 72–73). The court found that OAK had a duty to take the initiative, to disclose to the court

that the debtors' principal and the debtors were breaching court orders and obligations under Chapter

11, but had failed to do so. The court found that OAK knew of the debtors' failures to perform their

duties and to follow court orders, but did not come forward.

The court explained:

> The danger to counsel occurs, I think, when counsel confuses the
> fiduciary with the Debtor. When the attorney receives his
> instructions, he must assure that they are consistent with the Debtor-
> in-possession's fiduciary duty, rather than the Debtor's
> management's personal interest, or the Debtor's management's
> interest in proceeding down a course that may be inconsistent with the
> implementation of the fiduciary duty. If the instruction does not
> come from the fiduciary qua fiduciary, but rather from management
> playing some other role, then counsel is placed in a conflict. The

10

> attorney can, as Mr. Adams did in this case, counsel the client to reconsider the decision in light of fiduciary responsibilities. And the attorney can resign. If the former action fails, the latter action must occur. Counsel may not continue to operate in the case knowing that the client is consistently breaching Court orders and consistently breaching fiduciary duties. If the client consistently listens to instructions and refuses to comply with them, the lawyer may not continue to represent someone named a fiduciary, but who's not acting as a fiduciary. The lawyer may not carry out — the lawyer to the DIP may not carry out an instruction nor a course of conduct that is inconsistent with the duty of the DIP as a fiduciary. But that is what Mr. Adams and his firm I think did in this case.

(*Id.*, at 71). The bankruptcy court found that OAK's failure to "promptly act when counsel learned of irregularities" weighed against awarding all the fees sought. (*Id.*). The court noted that in part because of these failures, OAK had not performed its services "within a reasonable amount of time commensurate with the complexity, importance, and nature" of the problems, issues, and tasks addressed because the "case was allowed to drag out an inordinate amount of time." (*Id.*, at 75).

The bankruptcy court reviewed the 11 U.S.C. § 330 factors on compensation for debtors' attorneys. It found that OAK's fee application accurately reflected the legal work it had performed in the case, and that the hourly rates it charged were consistent with OAK's abilities and experience. (*Id.*, at 74–75). The court also found that OAK demonstrated "skill and experience in the bankruptcy field," (*id.*, at 76), and that OAK's rates were "reasonable based on the customary compensation charged by comparably skilled practitioners," (*id.*). Neither the number of hours reflected on the fee application nor the hourly rate is challenged on appeal.

The bankruptcy court analyzed the fees sought for OAK's services under *Pro-Snax*, 157 F.3d 414. The court identified the relevant holding as follows: "If the services provided by Debtor's counsel did not result in an identifiable, tangible, and material benefit to the bankruptcy estate, then the services are not compensable at all." (Docket Entry No. 748, at 76). Because it believed that

11

applying the *Pro-Snax* standard from a strict hindsight perspective would improperly convert every professional fee into a contingency fee, the court considered "both prospective and retrospective viewpoints in determining the amount of fees that should be awarded." (*Id.*, at 79). The retrospective view examines whether the services resulted in an identifiable, tangible, and material benefit to the bankruptcy estate, with the benefit of hindsight. The prospective view examines the apparent necessity of the services rendered at the time they were performed, not at some later date. *See In re Cyrus II P'ship*, 2009 WL 2855725, *4 (Bankr. S.D. Tex. Sept. 1, 2009) (defining the retrospective and prospective approaches).

The bankruptcy court examined OAK's work from both viewpoints. The court concluded that "[i]t is unambiguous that from a retrospective viewpoint that the estate and its creditors would have been better off if Debtor's counsel had performed no work." (*Id.*). In analyzing the case from a prospective viewpoint, the court noted that there was a question about whether it should "apply an actual facts scenario or . . . facts as represented by others to counsel scenario." (*Id.*). The court stated that it could not "allow counsel to examine prospectively through rose colored lenses." Instead, it would look "either at the actual facts as they existed for determining whether the work should have been performed, or at a minimum, the facts that a reasonable person would have concluded existed had they . . . reasonably evaluated them." (*Id.*, at 80). Calling the case "an ongoing disaster," the court found that, "[w]hether or not counsel is to blame for the disaster, they certainly are to blame for not understanding what was occurring with their own client." (*Id.*). The court agreed with OAK that "it was reasonable to believe that NCE continually wanted to do the deal," but found that "it was not reasonable to believe that the Debtor could ever get to the end point

of the deal and act in a manner consistent with the Bankruptcy Code and consistent with the prior orders that [had] . . . been issued by the Court." (*Id*.).

The bankruptcy court stated that it would "allow some fees for the initial organization of the case." (*Id*., at 81). These were "reasonable and necessary" because counsel had "the right to get their feet on the ground and learn what the case is about," and provided a "prospective benefit to the estate." (*Id*.). The court also found that "the agreement with the State of Texas" and, to a lesser extent, "work with respect to the Debtor-in-possession funding" produced a material and tangible benefit to the estate; both resulted in "money coming in that at a minimum [was] used to pay off some administrative creditors in the case, or at least eliminate the continued run up of administrative claims." (*Id*., at 73, 82).

Based on these findings, the court awarded "approximately one quarter" of the fees and expenses that OAK had requested. The court stated that this amount was $60,000. (*Id*.). One-quarter of the fee request is, however, around $93,000, not $60,000. The court ordered the Chapter 7 trustee to collect the difference between the court's $60,000 fee award and the funds already paid to OAK under the interim compensation procedures order. (*Id*.).

This appeal followed.

## II.     The Standard of Review

A district court functions as an appellate court when reviewing a bankruptcy court's decision. *In re Cahill*, 428 F.3d 536, 539 (5th Cir. 2005). This court reviews the bankruptcy court's determination of attorneys' fees and expenses under an abuse of discretion standard. *Calin & Drysdale Cartered v. Babcock & Wilcox Co.* (*In re Babcock & Wilcox Co.*), 526 F.3d 824, 826 (5th Cir. 2008). A bankruptcy court abuses its discretion if it: "(1) applies an improper legal standard

13

or follows improper procedures in calculating the fee award or (2) rests its decision on findings of fact that are clearly erroneous." *Id.* (quoting *Cahill*, 428 F.3d at 539). A bankruptcy court's legal conclusions are reviewed de novo and its fact findings are reviewed for clear error. *In re Stonebridge Techs., Inc.*, 430 F.3d 260, 265 (5th Cir. 2005). A factual finding is clearly erroneous when "'although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Orix Credit Alliance, Inc. v. Harvey (In re Lamar Haddox Contractor, Inc.)*, 40 F.3d 118, 120 (5th Cir. 1994) (citation omitted).

## III.    Analysis

### A.    The Legal Framework

Section 330 of the Bankruptcy Code governs compensation to debtors' counsel.[3]  11 U.S.C. § 330. A court may award "reasonable compensation for actual, necessary services rendered by the trustee, examiner, ombudsman, professional person, or attorney and by any paraprofessional person employed by any such person" and "reimbursement for actual, necessary expenses." 11 U.S.C. § 330(a)(1)(A),(B). In applying for fees, debtors' counsel must demonstrate that its work is actual and necessary and must show that the fee amount is reasonable under § 330. The Fifth Circuit generally uses the lodestar method to calculate reasonable attorneys' fees, including in Chapter 11 cases. *In re Cahill*, 428 F.3d 536 (5th Cir. 2005). The court multiplies the number of hours worked by the prevailing hourly rate in the community. *Shipes v. Trinity Indus.*, 987 F.2d 311, 319 (5th Cir. 1993).

---

[3]  Alternatively, a court may preapprove attorneys' fees under 11 U.S.C. § 328. If attorneys' fees are approved under § 328, a court may modify fees "only for developments unforeseen when originally approved." *In re Nat'l Gypsum Co.*, 123 F.3d 861, 862–63 (5th Cir. 1997). OAK does not challenge the bankruptcy court's application of § 330 on appeal.

The court "may adjust the lodestar up or down based on the factors contained in § 330[4] and its consideration of the twelve factors listed in *Johnson*.[5]"  *Cahill*, 428 F.2d at 440 (citing *Johnson v. Georgia Highway Exp., Inc*., 488 F.2d 714, 717–19 (5th Cir. 1974).  The  court has discretion in applying the *Johnson* factors, but it must briefly explain the weight given to each factor and its effect

---

[4] Section 330 of the Bankruptcy Code lists the following factors for determining "reasonable compensation":

> (A) the time spent on such services;
> (B) the rates charged for such services;
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
> (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
> (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

[5] The *Johnson* factors are:

> a) The time and labor required;
> b) The novelty and difficulty in the question presented;
> c) The required skill to perform the service properly;
> d) The preclusion of other employment due to the acceptance of the case;
> e) The customary fee;
> f) Whether the fee is fixed or contingent;
> g) Time limitations imposed by the client with the circumstances of the case;
> h) The amount involved and the results obtained;
> i) The experience, reputation, and ability of the attorney;
> j) The undesirability of the case;
> k) The nature and length of the relationship between the attorney and client; and
> l) Awards in similar cases.

*Johnson*, 488 F.2d at 719.

on the award.  *First Colonial Corp. of America*, 544 F.2d 1291, 1298–99 (5th Cir. 1997), *cert. denied*, 431 U.S. 904 (1977).

The leading Fifth Circuit case on applying § 330 to fee applications by a Chapter 11 debtor's attorney is *Pro-Snax*, 157 F.3d 414.  The first issue addressed in *Pro-Snax* is not relevant to this appeal: whether a Chapter 11 debtor's attorney may be compensated for work performed after a trustee's appointment under § 330(a) of the Bankruptcy Code.  The court held the Bankruptcy Code did not authorize postappointment legal fees.  The opinion then addressed the proper standard for a bankruptcy court to apply in awarding fees for representing a debtor before the Chapter 11 trustee is appointed. That standard, and how to apply it, is the primary issue raised on this appeal.

In *Pro-Snax*, the debtor's counsel, Andrews & Kurth ("A&K"), advocated a reasonableness test for determining whether its legal work should be compensated.  The reasonableness test would focus on "whether the services were objectively beneficial toward the completion of the case at the time they were performed."  *Id.* at 426.  The creditors argued that the correct standard was "a more stringent test — whether the legal services resulted in an identifiable, tangible, and material benefit to the bankruptcy estate."  *Id.*  The Fifth Circuit concluded "that the stricter test is the appropriate measure" and "in so holding, [found] that the bankruptcy court erred in taking a lenient view of the standard."  *Id.*  Citing *In re Melp, Ltd.*, 179 B.R. 636 (E.D. Mo. 1995),[6] the Fifth Circuit emphasized "that any work performed by legal counsel on behalf of a debtor must be of material benefit to the estate."  *Id.*  In doing so, the court affirmed the district court's instruction that the bankruptcy court

---

[6] The court in *Melp* held that in analyzing the benefits that an attorney's services provided, a court should consider: "(1) whether the debtor's attorney's actions duplicated the duties of the trustee or the trustee's counsel under 11 U.S.C. § 1106; (2) whether the services have in fact, obstructed or impeded the administration of the estate; and (3) whether the debtor's attorney's actions are consistent with the debtor's duties under 11 U.S.C. § 521."  179 B.R. at 640.

"consider strongly the debtor's lack of success in obtaining confirmation of the Chapter 11 plan." *Id.* The court found that this instruction was "consistent with the standards identified by Congress in § 330, which require that — at the time the services are performed — the chances of success must outweigh the costs of pursuing the action." *Id.*

In applying these legal standards to the facts in *Pro-Snax*, the Fifth Circuit held that the debtor's counsel could not be awarded fees because the legal services it performed did not result in a benefit to the estate. The court also found that when counsel performed the services, it should have been aware that its Chapter 11 plan would fail. *Id.* (note omitted).[7] "We believe that these facts necessarily should have led A&K to the conclusion that its services were futile, meaning that we would find against A&K even if we today adopted the reasonableness standard that it suggests." *Id.* n. 17.

The Fifth Circuit's retrospective approach has not been followed by most other circuits. *See In re Ames Dep't Dep't Stores, Inc.*, 76 F.3d 66, 72 (2d Cir. 1996), *abrogated on other grounds by Lamie v. U.S. Trustee*, 540 U.S. 526, 531 (2004) ("[I]f the services of a debtor's attorney are reasonably likely to benefit the debtor's estate, they should be compensable." (citation omitted));

---

[7] The court explained:

> Even though the bankruptcy court found support for the Chapter 11 plan among creditors other than the Petitioning Creditors and, if the plan had been confirmed, the estate could have been brought to a swifter conclusion than if the case were brought under Chapter 7, we find that A&K should have known from the outset that the Debtor's prosecution of a Chapter 11 plan would fail, given that the Petitioning Creditors — who collectively held more than 50% of the indebtedness in this case — filed an involuntary Chapter 7 case against the Debtor and repeatedly informed the Debtor and the bankruptcy court that they believed the case should be administered under Chapter 7.

(*Id.*).

*In re Veltri Metal Prods., Inc.*, 189 F. App'x 385, 389–90 (6th Cir. 2006) (examining whether the attorney's services were "reasonably likely to benefit the estate"); *Roberts, Sheridan & Kotel, P.C. v. Bergen Brunswi Drug Co. (In re Mednet)*, 251 B.R. 103, 107 (B.A.P. 9th Cir. 2000) (adopting a reasonableness standard and holding that "[t]he Fifth Circuit reasoning that a professional's services are only compensable if they result in a material benefit to the estate does not comport with a strict reading of the statute."); *In re Top Grade Sausage, Inc.*, 227 F.3d 123, 131–32 (3d Cir. 2000) (adopting a reasonableness test for determining attorney's fee); *In re Taxman Clothing Co.*, 49 F.3d 310, 316 (7th Cir. 1995) (holding that a debtor's attorney should "not be entitled to fees for services rendered after it became plain that the preference action would not yield a net gain."); *In re Double J Cattle Co.*, 226 B.R. 284, at *4–5 (B.A.P. 10th Cir. 1997) (applying a prospective standard for determining whether an attorney's service benefit the estate).

Lower courts in the Fifth Circuit have not found *Pro-Snax* easy to apply.  *See, e.g.*, *Kaye v. Hughes & Luce, LLP*, 2007 WL 2059724, at *8 (N.D. Tex. Jul. 13, 2007) ("[I]t is somewhat difficult to evaluate the *Pro-Snax* Court's reasoning for [adopting a material benefits test], as the panel did not explain *why* it chose to embrace the stricter hindsight measure, and it cited only one case . . . ." (emphasis in original)).  One question courts have asked is whether the "material benefit" inquiry should be applied looking solely at the results of those efforts, with the benefit of hindsight, or whether it is also appropriate, and permissible, to consider the likely benefit of the services at the time counsel performed them.

While most bankruptcy and district courts in the Fifth Circuit have held that *Pro-Snax* requires the court to consider whether the legal services materially benefitted the estate

18

retrospectively, using hindsight, these courts have applied the requirement in different ways.[8]  Some

courts have adopted a pure hindsight approach to determining whether the legal services benefitted

the estate.  *See In re Weaver*, 336 B.R. 115, 119 (Bankr. W.D. Tex. Jul. 20, 2011) (adopting a pure

hindsight approach); *Quisenberry v. Am. South Bank (In re Quisenberry)*, 295 B.R. 855, 865 (Bankr.

N.D. Tex. 2003) (same).  Other courts have stated they were applying a hindsight approach but have

included prospective elements in their analysis.  *See PriceWaterHouseCoopers, LLP v. Litzler (In*

*re Harbor Financial Group, Inc.)*, 2001 WL 1041785, at *3–4 (N.D. Tex. Sept. 5, 2001) (adopting

retrospective tests but finding that the debtor's counsel "overlooked or ignored the realities of the

situation, and in doing so, it assumed the risk that some of its fees would be denied.").  A common

approach has been to examine the benefit of the legal services both prospectively and

retrospectively, a so-called hybrid approach.  *See Cyrus II P'ship*, 2009 WL 2855725, at *5

(adopting a hybrid approach); *In re Spillman Dev. Group, Ltd.*, 376 B.R. 543, 550–54 (Bankr. W.D.

Tex. 2007) (same).

        In *In re Broughton Ltd. Partnership*, 474 B.R. 206, 210–11 (Bankr. N.D. Tex. 2012), the

bankruptcy court recognized *Pro-Snax* as binding precedent but attempted to "perform its

retrospective analysis of the Firm's work in a fashion that minimizes rather than maximizes

difference in result between the Fifth and other circuits."  *Id.*, at *212–13.  The court noted that

limiting compensation to work that directly adds value to an estate would exclude payment for

---

        [8]  Some courts have declined to apply the hindsight approach.  In *In re Gadzooks, Inc.*, 352 B.R.
796 (2006), the bankruptcy court found that the *Pro-Snax* court's benefits analysis was dictum and
analyzed the debtor's counsel's attorney's fee request under a prospective reasonableness standard.  *Id.* at
809.  The bankruptcy court's decision was reversed by the district court, which held that *Pro-Snax*
adopted a retrospective test for fee awards and that this test was binding.  *Kaye*, 2007 WL 2059724, at
*6–8.

services that may be essential to a Chapter 11 case, including initial research, administrative matters, and disputes over control. *Id.*, at 213–14. The court also focused on the policy implications of adopting a strict retrospective standard. Using as an example *Stern v. Marshall*, — U.S. —, 131 S.Ct. 2594 (2011) — in which Chapter 11 counsel lost in a 5-to-4 decision in the United States Supreme Court — the bankruptcy court noted that "[l]itigation on behalf of the estate may offer the prospect of substantial recoveries, but will not necessarily be won." *Broughton*, 474 B.R. at 214. It concluded that if "a professional was justifiably pursuing a legitimate, realizable goal of the fiduciary client[, this] should be enough benefit to the estate to satisfy *Pro-Snax*." (*Id.*, at 218).

Some district courts in the Fifth Circuit have reconciled *Pro-Snax*'s emphasis on a retrospective analysis with § 330(a)(3)(C)'s reference to the prospective analysis through the hybrid approach. These courts have held that the retrospective material-benefits standard used in *Pro-Snax* should be viewed as interpreting how a court decides whether legal services were "actual" and "necessary." *See Kaye*, 2007 WL 2059724, at *9 ("This reading of *Pro-Snax* is consistent with the district court's opinion in that case, which indicated that the determination of whether an attorney's services benefitted the estate forms a component part of whether such services were 'necessary' within the meaning of § 330(a)(1)(A)."). This reading of *Pro-Snax* is also consistent with the district court's opinion in *Pro-Snax*, which the Fifth Circuit cited approvingly and affirmed. 212 B.R. at 839 n. 9 (citing *In re Lederman Enters., Inc*., 997 F.2d 1321, 1323 (10th Cir. 1993) (stating that "the beneficial nature of legal services must be determined before a reasonableness inquiry may even be conducted[.]"), and *In re Dixon*, 143 B.R. 671, 678 (Bankr. N.D. Tex. 1992) ("The main inquiry under § 330 is whether the post-petition services were necessary and benefitted the estate.")). This interpretation of *Pro-Snax* does not read § 330(a)(3)(C)'s prospective requirement out of the statute.

Under this reading of *Pro-Snax,* a court should apply the retrospective test of "resulting" benefit, but the court should also consider the legal services at the time those services were provided as one factor in determining whether the requested fees are "reasonable."

The issues on this appeal are whether the record supports the bankruptcy court's application of *Pro-Sna*x and whether the fee award is reasonable.

### B.       Whether the Bankruptcy Court Erred in Applying *Pro-Snax*

In applying a hybrid approach to *Pro-Snax,* the bankruptcy court analyzed whether OAK's work materially benefitted the debtors both prospectively, measured from when the services were provided, and retrospectively, measured using hindsight. OAK criticizes the bankruptcy court's use of a retrospective standard to deny OAK most of the fees it requested. OAK argues that the retrospective standard is not required or permitted by the Fifth Circuit's *Pro-Snax* decision. *Pro-Snax* and subsequent opinions interpreting and applying it defeat this argument.

The *Pro-Snax* court explicitly rejected a "reasonableness test" that would look at whether the legal services performed were "beneficial toward the completion of the case *at the time they were performed*." 157 F.3d at 426 (emphasis added). Instead, the court adopted a standard focused on whether the legal services "*resulted* in an identifiable, tangible, and material benefit to the bankruptcy estate." *Id.* (emphasis added). The court also cited with approval the "district court's instruction to the bankruptcy court, to consider strongly the debtor's *lack of success* in obtaining confirmation of the Chapter 11 plan." *Id.* (emphasis added).[9] *Pro-Snax* clearly requires that the

---

[9]  The district court's discussion of the proper standard was brief and largely limited to a footnote. It stated: "[t]he bankruptcy court found that 'in this case it was reasonable for debtor to try to confirm a plan.' The standard under § 330(a)(1)(A), however, is whether an attorney's services were 'necessary,' i.e., whether they were beneficial to the estate." *In re Pro-Snax Distributors, Inc*., 212 B.R. 834, 839 n. 9 (N.D. Tex. 1997) (citations omitted).

court consider whether the legal services actually benefitted the estate, which requires a retrospective view.

OAK correctly notes that in one part of the *Pro-Snax* opinion, the Fifth Circuit appears also to have applied a prospective reasonableness standard to the facts of the case. "[W]e find that A&K *should have known from the outset* that the Debtor's prosecution of a Chapter 11 plan would fail . . . ." *Id.* (emphasis added). In a footnote, the court clarified that it "would find against A&K *even if* we today adopted the reasonableness standard that it suggests." *Id.* (emphasis added); see also ); *Weaver*, 336 B.R. at 119 ("The Fifth Circuit simply said that if they had applied the reasonableness test, they still would not have allowed any fees with regard to prosecution of the Chapter 11 plan under the facts of the case."). To the extent OAK is asking for a reasonableness test, or only a prospective test, *Pro-Snax* rejects that result. *See Pro-Snax*, 157 F.3d 414; *see also Kaye*, 2007 WL 2059724, *10 (calling the Fifth Circuit's rejection of a reasonableness test "explicit").

OAK argues that a strict retrospective test contradicts § 330, which states that a relevant factor in determining reasonable compensation is "whether the services were necessary to the administration of, or beneficial *at the time at which the service was rendered* toward the completion of, a case under this title." 11 U.S.C. § 330(a)(3)(C) (emphasis added). In *Pro-Snax*, the Fifth Circuit held that considering a debtor's "lack of success in obtaining confirmation of the Chapter 11 plan is consistent with [§ 330(a)(3)(C)]." *Pro-Snax*, 157 F.3d at 426. Section 330 states that, in awarding fees, a court must decide both whether the services provided were "actual" and "necessary" and whether the compensation requested is "reasonable." 11 U.S.C. § 330(a)(1)(A). As noted, some courts have reconciled *Pro-Snax* with this language through the hybrid approach the bankruptcy court also used in this case.

22

OAK argues that it is impossible to apply both the prospective and retrospective viewpoints in awarding fees. *See In re Spillman Dev. Group LTD*., 376 B.R. 543, 550 (Bankr. W.D. Tex. 2007) ("In this combined state it seems the latter consumes the former as it is hard to imagine any situation where the latter exists and the former does not."). It is often true that a finding that legal services resulted in a material benefit to the debtor will also mean that the attorney acted reasonably in choosing to perform those services. Courts have recognized, however, that the latter can exist when the former does not — that is, that services that are likely to benefit the estate may, in the end, provide no benefit. An obvious example is a hard-fought litigation on legal or factual questions on which courts are divided. *See Broughton*, 474 B.R. at 214 (discussing the case history of *Stern v. Marshall*). And, in rare circumstances clearly not present here, legal services that appeared to be unreasonable when they were performed might result in a benefit to the estate. *See Kaye*, 2007 WL 2059724, at *9 n. 4 ("One can envision certain scenarios — however unlikely — where an attorney's services actually result in a material benefit to a debtor's estate, and hence are deemed 'necessary," but where such service were not reasonably likely to benefit the estate at the time they were performed.").[10] OAK's generalized argument is not persuasive.

Echoing the bankruptcy court's opinion in *Broughton*, OAK argues that using a retrospective test in awarding attorneys' fees is bad policy. OAK criticizes the retrospective test as turning hourly rates into one-way continency fees. OAK argues that a retrospective test would hurt legitimate professional efforts toward effective estate administration by deterring lawyers from performing work that they reasonably believed at the time would benefit the estate. OAK also contends that

---

[10]  The hybrid approach requires that the retrospective standard be applied first to determine the "actual, necessary" services that were provided. The prospective approach is then used as one of several factors in weighing the reasonableness of the compensation requested.

using a retrospective tests harms debtors by dissuading well-qualified attorneys from representing them in Chapter 11 cases.  These policy arguments do not permit this district court to disregard binding Fifth Circuit precedent.  The Fifth Circuit precedent rejects the reasonableness approach; requires a careful retrospective look at material benefit to the estate, using hindsight to consider whether the legal services were actual and necessary to the estate; and, as interpreted by most courts in this circuit applying *Pro-Snax*, allows a court to consider the reasonableness of the fees sought by looking at whether, at the time the legal services were performed, they were likely to provide material benefit to the estate.  *Kaye*, 2007 WL 2059724, *5–7.

The bankruptcy court found that three categories of OAK's legal services were compensable because they provided an identifiable, tangible, material benefit to the debtors' estate.  These categories of services are: (1) the "initial organization of the case," (Docket Entry No. 748, at 73); (2) the work to achieve an agreement between Sterling and the GLO on the settlement of the disputed oil and gas leases, (*id*. at 81); and the settlement of the dispute with the GLO on the amount of royalties Sterling owed, (*id*.); and (3) to a lesser extent, some of the DIP financing work.  The bankruptcy court did not err in finding that these were the categories of services that provided material benefit to the debtors' estate.  The initial review resulted in a material, though indirect, benefit to the estate.  *See JNS Aviation*, 2009 WL 80202, at *8 ("The Court does not construe the benefits analysis to require that each expenditure of time result in a quantifiable benefit to the estate.").  The GLO had questioned the validity of four of Sterling's oil and gas leases.  OAK's work resulted in the GLO decision that three of the four leases were valid.  OAK was also able to convince the GLO to reduce the amount Sterling owed in penalties by $32,000.  These efforts directly increased the value of the debtors' estates.  OAK's successful negotiations with the GLO

also depended on its initial general research and organizational work.  Finally, the bankruptcy court

recognized that, to a "lesser extent," some of the work on some of the DIP financing might be

compensable, but did not specify the extent of the work benefitting the debtors in setting the fee

award.

OAK criticizes the bankruptcy court for failing to find that other legal services it performed

for the debtors resulted in material benefits.  Many of the legal services that OAK discusses resulted

in the debtors' estates incurring additional expenses or otherwise losing value.[11]  OAK's decision

to seek reorganization and its resistance to creditor attempts to convert the debtors' bankruptcy to

Chapter 7 prolonged the Chapter 11 case and depleted the estate's assets.  During much, if not all,

of the Chapter 11 case, the debtors' administrative expenses exceeded income.  The debtors' use of

cash collateral deprived the estate of valuable assets.  The DIP loans that the debtors used to finance

OAK's unsuccessful reorganization efforts increased the estate liabilities to creditors.  The

bankruptcy court properly denied OAK fees for services that did not, even indirectly, result in a

---

[11]  Among the benefits that OAK states that it provided to the debtors but that the district court
did not consider are:

- approval of use of cash collateral;
- approval of a DIP loan from HAEC;
- approval of three DIP loans from NEC;
- negotiations with various potential purchasers and plan proponents;
- filing of five reorganization plans;
- approval of the debtors' fourth amended disclosure statement and creditor approval of the
  debtors' fourth amended reorganization plan;
- reviewed, analyzed, and drafted objections to the reorganization plans and disclosure statements
  submitted by Mining Oil and Downstream Capital;
- reviewed proofs of claim and pursued claim objections;
- reviewed and responded to motions for allowance and payment of administrative expense claims
  and successfully negotiated settlements with various administrative claimants;
- responded to several motions to lift the stay or to convert;
- prepared for and attended the depositions of members' management.

(Pet's Br. at 17–18).

tangible and material benefit to the debtors, viewed both retrospectively and prospectively.  This court affirms the bankruptcy court's identification of the three categories of legal services that are compensable and the court's rejection of the fee application for the other services OAK performed.

Although the bankruptcy court correctly applied *Pro-Snax*'s requirement that it award fees based on whether the attorneys' services resulted in a material benefit, it is not clear from the record whether the court properly calculated the fee amount.  The bankruptcy court awarded OAK $60,000 in fees and expenses.  (*Id.*).  The court explained that this was a reasonable amount for the three categories of compensable legal services OAK provided, but did not state how it arrived at this figure other than that it represented  "approximately one quarter" of the fees and expenses that OAK had requested.[12]

The fee application OAK submitted included a summary of 1,307.10 hours spent on professional services on the debtors' behalf from January 9 to December 8, 2009.  The summary divides the work into nine categories: case administration; asset disposition; relief from stay/adequate protection proceedings; meetings of and with creditors; fee/employment applications; other contested matters; financing/cash collateral; claims administration and objections; and plan and disclosure statement.  These categories do not track or correspond to the three categories of legal services the bankruptcy court found compensable: initial organization of the case; settling the dispute with the GLO on the four disputed oil and gas leases; settling the dispute with the GLO on the amount of royalties Sterling owed; achieving materially beneficial DIP financing.  The parties did not identify or provide any efficient way for the court to identify, how many hours OAK spent

---

[12]  OAK had requested about $370,000 in total compensation.  The bankruptcy court's award of $60,000 is substantially less than one quarter of OAK's request.

on these three categories of legal services. Because the record does not reveal the connection between the $60,000 awarded and the hours expended or the result obtained, the fee amount is reversed and this case is remanded for the bankruptcy court to determine the reasonable fee, after OAK identifies the number of hours to be allocated to the three categories of compensable services.

### C.   Whether the Bankruptcy Court Erred in Finding that OAK Had Violated Its Fiduciary Duties to the Debtors' Estates

OAK challenges that bankruptcy court's ruling reducing OAK's compensation on the basis that the firm violated its fiduciary duties to the debtors' estates by prolonging the Chapter 11 case and acting in Cheatham's interests to the debtors' detriment. OAK alleges that before the bankruptcy court removed Cheatam as the debtors' manager, it properly advised Cheatham of a debtor-in-possession's responsibilities under the Bankruptcy Code. OAK admits that Cheatham violated those responsibilities. But OAK contends that it did not discover that Cheatham had taken improper actions until shortly before the creditors and the court discovered those actions. OAK also argues that it did not have a duty to inform the court of Cheatham's actions and that imposing such a duty  would create a conflict of interest.

This court has already found that the bankruptcy court did not err in reducing OAK's requested compensation based on the finding that much of OAK's work did not result in a material benefit to the debtors' estates. The court does not reach the issue of whether the bankruptcy court's finding that OAK breached its fiduciary duties to its clients provides an independent basis for reducing OAK's compensation award.

## V.   Conclusion

The bankruptcy court's findings and conclusions that OAK's compensation award should be reduced on the basis that, aside from its initial research and organizational work, its negotiations

with the GLO, and its DIP financing work, OAK's services did not result in a material benefit to the

debtors' estate, is affirmed.   The bankruptcy court's award of $60,000 is vacated.   The case is

remanded to the bankruptcy court for further proceedings consistent with this memorandum and

opinion.

SIGNED on December 21, 2012, at Houston, Texas.

Lee H. Rosenthal
United States District Judge